UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

WILLIAM OSWALDO MORAN-MARTINEZ,

                Defendant.
_____

REPORT & RECOMMENDATION

10-CR-6168L

**PRELIMINARY STATEMENT**

By Order of Hon. David G. Larimer, United States District Judge, dated August 31, 2010, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 5).

Defendant William Oswaldo Moran-Martinez ("Moran") is charged in a one-count indictment with illegally reentering the United States after having previously been deported following a conviction for an aggravated felony, in violation of 8 U.S.C. §§ 1326(a) and (b)(2).  (Docket # 4).  The indictment alleges that Moran was deported on April 28, 1998, November 22, 1999 and May 28, 2003.  (*Id.*).

Currently pending before this Court are motions by Moran to suppress statements and physical evidence.  (Docket # 23).[1]  Specifically, Moran seeks to suppress statements he made to law enforcement agents on March 12 and 13, 1998, prior to Moran's first deportation,

---

[1] Moran's omnibus motion also sought, *inter alia*, discovery and inspection, rulings pursuant to Federal Rules of Evidence 404, 608 and 609 and *Jencks* material.  (Docket # 23).  Each of these requests was either resolved by the parties or decided in open court by the undersigned on December 12, 2010.  (Docket # 27).

and asks this Court to reconsider its earlier decision not to hold an evidentiary hearing on that motion. (*Id*.; January 19, 2011 letter from Mark D. Hosken, Esq.).[2] In addition, Moran seeks to suppress a New York State identification card, a social security card and a Guatemalan consular identification card. (*Id*.).[3]

On January 10, 2011, this Court held an evidentiary hearing on Moran's motion to suppress the physical evidence. (Docket # 32).[4] Both parties filed post-hearing supplemental submissions. (Docket ## 35, 37).

The following constitutes this Court's report and recommendation.

---

[2] Moran initially moved to suppress additional statements allegedly made by Moran during civil immigration proceedings. (Docket # 23 at ¶ 12). At oral argument on his motion, this Court invited both parties to submit letter memoranda on the issue whether *Miranda* warnings were required in administrative immigration proceedings. Both parties did so. (*See* December 13, 2010 letter from Assistant United States Attorney Marisa Miller and December 13, 2010 letter from Mark D. Hosken, Esq.). The Court thereafter held a conference with counsel and advised that, based upon a review of relevant authority, a hearing did not appear to be necessary concerning the circumstances of the 1998 statements. (Docket # 32 at 3). Those statements were identified as Exhibits C and D. As for the remaining statements, I advised the parties that a hearing appeared necessary. (*Id*. at 4). Accordingly, I invited the government to identify for the Court the specific statements it intended to offer at trial. (*Id*.). On January 21, 2011, the government advised that it did not intend to introduce the statements identified as Exhibits E, F, G, H, I, J, K and L, rendering moot Moran's motion to suppress those statements. (*See* January 21, 2011 letter from Assistant United States Attorney Marisa Miller).

On January 19, 2011, Moran requested that this Court reconsider its decision not to hold a hearing on the circumstances surrounding Moran's 1998 statements identified as Exhibits C and D. (*See* January 19, 2011 letter from Mark D. Hosken, Esq.).

[3] Moran initially also sought to suppress a partial bullet casing, but the government represented that it does not intend to offer the bullet casing at trial because it has been lost. (Docket ## 23 at ¶ 6; 26 at 2).

[4] The transcript of the suppression hearing conducted before this Court on January 10, 2011, shall be referred to herein as "Tr. ___." (Docket # 32).

**FACTUAL BACKGROUND**

I. **Testimony of Hess**

Jason Hess ("Hess"), a police officer employed by the City of Rochester, testified that he was on duty on August 15, 2010 from 2:45 p.m. to 11:00 p.m. (Tr. 5-6). Hess testified that on that night, he and another Rochester police officer, Officer Engineer ("Engineer"), were dispatched to 378 Augustine Street in response to a 911 call.[5] (Tr. 6, 17, 19). When he arrived, Hess spoke with the defendant, who told Hess that his name was William Moran. (Tr. 6-7). When Hess asked Moran for identification, Moran told him that he had it "next door." (Tr. 7). Hess testified that he and Engineer then walked with Moran to the house next door and entered it. (Tr. 7). Moran led Hess and Engineer through the living room and to a bedroom on the second floor. (Tr. 7-8). In the bedroom, Moran gave him a passport. (Tr. 8).[6]

Engineer then telephoned United States Border Patrol Agent Antone Cappola ("Cappola"). (Tr. 20). When Cappola called back, Moran overheard an automated feature on Engineer's phone announce aloud that "Border Patrol" was calling. (Tr. 20-21). Hess testified that after Cappola's call, he placed Moran in handcuffs. (Tr. 8). According to Hess, Moran then told him he "was only allowed to bring one bag with him" and pointed to a black backpack that he wanted Hess to help him pack. (Tr. 8-9). Hess testified that he told Moran that he would have to check the backpack before packing it. (Tr. 10). Hess picked up the backpack and emptied its contents, most of which were articles of clothing. (Tr. 9-10). Moran identified certain clothing and a photograph that he wanted Hess to pack in the backpack. (Tr. 10).

---

[5] The testimony adduced at the hearing did not explain the nature of the 911 call.

[6] Moran does not seek to suppress the passport. (Docket # 23 at ¶ 10).

Hess stated that Moran also pointed to a black mesh bag that was on the floor. (*Id.*). Hess testified that he picked it up and told Moran that he would have to check its contents also. (Tr. 10-11). Moran told him that he "could check it if [he] had to, but there was nothing in it." (Tr. 11). Hess testified that he then emptied the contents of the bag on the bed. (*Id.*). According to Hess, a false New York State identification card (the "ID card") and social security card fell out of the mesh bag. (*Id.*). Hess testified that he recognized that the ID card was not genuine because it was the wrong color and texture; it bore Moran's photograph, but not the name he had provided Hess. (Tr. 12). The social security card appeared genuine except that it had the same name as on the false ID card. (*Id.*). Hess retrieved the ID card and social security card and gave them to Engineer. (Tr. 13, 22). Other than emptying the contents of the two bags onto the bed, Hess did not search the bedroom or its contents. (Tr. 14).

After retrieving the two cards, Hess resumed packing the clothing that Moran requested. (*Id.*). When they were done, Hess, Engineer and Moran left the house and waited on the sidewalk for Cappola to arrive. (*Id.*).

II. **Testimony of Cappola**

Agent Antone Cappola testified that he was on duty on August 15, 2010 from 10:00 p.m. to 6:00 a.m. (Tr. 24-25). At approximately 9:40 p.m., he received a call from Engineer, who gave Cappola the name and date of birth of a person he was trying to identify. (Tr. 25, 36-39). Cappola testified that he was on his way to work at the time he received Engineer's call, that he continued his way to the station in order to obtain a patrol car and then responded to 378 Augustine Street at approximately 10:10 p.m. (Tr. 40-41). Cappola learned

from his investigation that Moran had a prior deportation record, as well as a criminal record. (Tr. 42-43).

Cappola met Moran and the two Rochester police officers on the sidewalk on Augustine Street. (Tr. 25-26). Cappola testified that the officers gave him the fraudulent ID card, a social security card and a wallet. (Tr. 26). Cappola then assumed custody of Moran, advised him that he was under arrest for being present in the United States illegally and performed a pat-frisk. (Tr. 27, 43, 45). Cappola put Moran in the backseat of his vehicle and placed the ID card, social security card and wallet on the dashboard of his vehicle. (Tr. 27).

Cappola testified that he then transported Moran to the Border Patrol Station in Irondequoit, New York. When they arrived, Moran was searched more thoroughly, although Cappola could not recall whether he or another agent performed the search. (Tr. 28). Cappola further testified that he "may have" fingerprinted Moran, but also could not remember doing so. (Tr. 30).

According to Cappola, he retrieved the ID card, the social security card and the wallet from his vehicle and placed them on a metal table in the processing center. (Tr. 29-30, 31). Cappola testified that he saw a Guatemalan consular identification card being taken out of Moran's wallet, although he could not recall who had removed it; nor could he remember whether he himself may have removed it. (Tr. 58-59, 65; G. Ex. 2). Cappola testified that the wallet was dark-colored, but that he could not remember any more details about its appearance or its contents. (Tr. 64, 65). He recalled that the consular card was blue and had Moran's name and

date of birth. (Tr. 32). The consular card, as well as some currency, were placed with the other items on the table in the processing center. (Tr. 31).[7]

On cross-examination, Cappola admitted that in preparation for the hearing, he had written an email to the prosecutor stating, "If you consider the people I encounter and detain or arrest and helping other agents with people that they deal with, everything becomes one large blurred event." (Tr. 50-51). The email also stated, "I may have thoroughly searched [Moran] at the station and thrown away the bullet and searched through his belongings and wallet, but I'm not 100% sure." (Tr. 52).[8]

## DISCUSSION

### I. Suppression of Physical Evidence

"On a motion to suppress evidence in a criminal trial, once [the defendant] establishes a basis for his motion, the burden rests upon the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers." *United States v. Wyche*,

---

[7] Cappola testified that Border Patrol agents are required to conduct inventory searches in order to log any currency and contraband found in a detainee's possession. (Tr. 31-32, 67-69, 73-74). Currency and contraband are recorded on a property inventory form (Tr. 67-68, 73-74), while other items, such as identification, are listed on and maintained in the alien's file, which accompanies the alien to the immigration facility where he or she is detained. (Tr. 32, 68-69, 71, 75).

[8] During the evidentiary hearing, Moran offered the email into evidence under Federal Rule of Evidence 801(d)(2)(A) as an admission by a party-opponent. (Tr. 51, 53-54, 78). The government opposed its admission, but did not object to questioning Cappola about the contents of the email. (Tr. 51, 54, 79-80). This Court reserved on the issue. (Tr. 54, 80). Moran then submitted a supplemental letter withdrawing his motion to admit the email as an admission by a party-opponent, but reasserting his request that it be admitted on other grounds. (*See* January 19, 2011 letter from Mark D. Hosken, Esq.).

I sustain the government's objection, but note that the substance of the email is part of the evidentiary record before this Court. On cross-examination, without objection by the government, Cappola acknowledged the accuracy of verbatim quotations from the email. (Tr. 50-52).

307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004) (citing *United States v. Gotti*, 244 F. Supp. 2d 120, 124 (E.D.N.Y. 2003); *United States v. Dickerson*, 113 F. Supp. 2d 324, 326 (N.D.N.Y. 2000)); *see United States v. Pena*, 961 F.2d 333, 338-39 (2d Cir. 1992) (on motion to suppress, government bears burden of establishing probable cause for warrantless arrest) (*quoting United States v. Rivera*, 321 F.2d 704, 706 n.1 (2d Cir. 1963)).

### A. The ID Card and Social Security Card

Moran contends that the ID card and the social security card should be suppressed as fruit of a warrantless search. (Docket # 35 at 7). The government maintains that the items were properly seized under the plain view doctrine. (Docket # 37 at 3).

I easily find that seizure of the ID card and the social security card was permissible under the plain view exception to the Fourth Amendment. The plain view doctrine "authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *Illinois v. Andreas,* 463 U.S. 765, 771 (1983). Application of the plain view exception requires that, first, the officer have a legitimate right to be in the location from which the object was plainly viewed; second, that the item's incriminating character be "immediately apparent"; and, third, that the officer have lawful access to the object. *Horton v. California*, 496 U.S. 128, 136-37 (1990).

In this case, Hess had a legitimate right to be in Moran's bedroom where he viewed the two cards because Moran had led him into his house and into the bedroom in order to obtain his passport for identification. The false and incriminating nature of the two cards was immediately apparent to Hess when they fell out of the mesh bag. Specifically, the ID card

appeared to be fraudulent based upon its color and texture. In addition, it had Moran's picture, but not the name he had provided Hess. The social security card likewise bore the same name that appeared on the ID card. Finally, the record demonstrates that Hess had lawful access to the two cards because Moran consented to Hess's search of the bag. Specifically, Moran told Hess that he "could check [the black mesh bag] if [he] had to, but there was nothing in it." (Tr. 11). Indeed, it was Moran himself who identified the bag as one he wanted to bring with him during his detention. (Tr. 10).

On this record, I find that the two cards were lawfully seized without a warrant pursuant to the plain view doctrine.

### B. Consular ID Card

Moran contends that the government has failed to meet its burden in establishing that the consular ID card was lawfully seized because Cappola's testimony was so unreliable as to render it inadmissible. (Docket # 35 at 9). Specifically, Moran contends that Cappola's memory lapses are so substantial that they warrant striking his testimony in its entirety under Rule 602 of the Federal Rules of Evidence. (*See* January 19, 2011 letter from Mark D. Hosken, Esq.).

Rule 602 provides, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Testimony is admissible under the rule if "a reasonable trier of fact could believe the witness had personal knowledge." *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 764 (2d Cir. 1991). *Accord United States v. Tocco*, 135 F.3d 116, 128 (2d Cir.), *cert. denied*, 523 U.S. 1096 (1998). "The result of a witness's observations need not be positive or

absolutely certain to make his testimony admissible." *United States v. Rodriguez*, 968 F.2d 130, 143 (2d Cir.) (citing *United States v. Evans*, 484 F.2d 1178, 1181 (2d Cir. 1973)), *cert. denied*, 506 U.S. 847 (1992). *See also Sec. and Exch. Comm'n v. Singer*, 786 F. Supp. 1158, 1167 (S.D.N.Y. 1992) ("[t]estimony is admissible even though the witness is not positive about what he perceived, provided the witness had an opportunity to observe and obtained some impressions based on his observations"). Lack of certainty as to a specific recollection generally affects the weight, rather than admissibility, of the evidence. *United States v. Rodriguez*, 968 F.2d at 143.

On this record, I find that Cappola's testimony establishes an adequate foundation upon which to conclude that it was based upon his personal knowledge. Although Cappola testified that he was not "100% sure" whether he searched Moran, his belongings or the wallet at the station and admitted that he had characterized the occurrences of that evening as "one large blurred event," those admissions properly affect the weight to be given his testimony, not its admissibility.

In any event, Cappola's testimony is largely irrelevant to the issues before the Court. The ID card and social security card were lawfully seized by Hess and identified by him at the hearing. With respect to the wallet, however, the government elicited no testimony as to the circumstances of its seizure. It was never mentioned by Hess in his testimony. Thus, the record does not permit this Court to find whether it was taken by Hess or Engineer from Moran's person, from his bedroom or from some other location. Nor does the record permit the Court to find whether it was seized pursuant to some exception to the Fourth Amendment, such as the plain view or search incident to arrest doctrines, or whether it was picked up by one of the officers without Moran's knowledge or consent. Because the government did not offer any

9

testimony on the wallet's seizure, the Court has no alternative but to find that it did not meet its burden of proof and that, because the consular identification card was inside the wallet, suppression of that card is warranted.

II.  **Suppression of Statements**

I turn finally to Moran's challenge to certain statements the government seeks to introduce against him.

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). "Custodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures . . . (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought (the investigative intent requirement)." *United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (quoting *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987)) (internal citations omitted).

*Miranda* warnings are not required before questioning an alien in custody in connection with civil deportation proceedings, even where the alien's statements result in deportation. *United States v. Rodriguez*, 356 F.3d at 259; *Avila-Gallegos v. Immigration and Naturalization Serv.*, 525 F.2d 666, 667 (2d Cir. 1975). *See also United States v. Solano-Godines*, 120 F.3d 957, 960-61 (9th Cir. 1997), *cert. denied*, 522 U.S. 1061 (1998). *Miranda* warnings are required, however, where the law enforcement agent is aware that the alien's statements may be used in connection with a criminal prosecution for violating

immigration laws.  *Rodriguez*, 356 F.3d at 259; *United States v. Salgado*, 292 F.3d 1169, 1172 (9th Cir.), *cert. denied*, 537 U.S. 1011 (2002).

In *Rodriguez*, a defendant charged with illegal reentry sought to suppress statements he had made during an earlier pre-deportation prison interview on the grounds that they were elicited in violation of *Miranda*.  356 F.3d at 257.  The Second Circuit held that *Miranda* warnings were not required because "[t]he information disclosed in the interview did not become relevant to a criminal proceeding against [defendant] until three years later . . . [and] [t]here is nothing in the record to indicate that [the agent] knew or should have known that evidence for an eventual prosecution would emerge from his administrative interview of [defendant]."  *Id.* at 259.

*Rodriguez* requires denial of Moran's suppression motion.[9]  Moran seeks to suppress two statements regarding his immigration status that he allegedly made on March 12, 1998 and March 13, 1998, before his first deportation from this country.  (Docket # 23, Exs. C and D).  *Miranda* warnings were not required because the questioning occurred in connection with civil deportation proceedings.  Moreover, the officer did not know and could not have known that his questioning would yield evidence to support a criminal prosecution for an event – illegal reentry – that had not yet occurred.  Applying *Rodriguez*, denial of the suppression motion is required as a matter of law, and I adhere to my earlier determination that no purpose would be served by an evidentiary hearing.

---

[9] There appears to be no dispute that Moran was in custody at the time of the statements.

## **CONCLUSION**

For the reasons stated above, I recommend that the district court deny Moran's motions to suppress the New York State identification card and the social security card seized from him and the March 1998 statements. (Docket # 23). I further recommend that the district court grant Moran's motion to suppress the Guatemalan consular identification card. (Docket # 23).

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      May  20 , 2011

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[10]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

    *s/Marian W. Payson*
    MARIAN W. PAYSON
    United States Magistrate Judge

Dated: Rochester, New York
      May   20  , 2011

---

[10] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).